IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AARON CARTER,

                Petitioner,

    v.

SUPT. VINCENT MOONEY, et al.,

                Respondents.

CIVIL ACTION
NO. 15-4896

## OPINION

**Slomsky, J.**                                                **January 31, 2017**

## I.    INTRODUCTION

Before the Court is Aaron Carter's ("Petitioner") counseled Petition for a Writ of Habeas Corpus. Petitioner filed the instant Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.)

On June 6, 2016, Magistrate Judge Thomas J. Rueter issued a Report and Recommendation recommending that the Petition be denied. (Doc. No. 16 at 35.) On August 8, 2016, Petitioner filed objections to the Magistrate Judge's Report and Recommendation. (Doc. No. 21.) On August 11, 2016, Respondents filed a Response. (Doc. No. 23.) The Court has reviewed this case de novo and for reasons that follow, the Court will adopt Magistrate Judge Thomas J. Rueter's Report and Recommendation denying the Petition.

## II.    BACKGROUND

### A.  Facts

The facts in this case are taken from summarized portions found in the Report and Recommendation of United States Magistrate Judge Thomas J. Rueter. (Doc. No. 16.)

The trial court summarized the facts and procedural history of this case as follows:

> On December 14, 2004, Rashaad Lowman ("Lowman") told his grandmother that he was walking around the corner to see his girlfriend. N.T. 12/2/08, pgs. 58-59. Lowman walked to the intersection of 73rd and Renovo Streets in the City and County of Philadelphia where he saw his thirteen year-old cousin, Yasin Lowman ("Yasin") hanging out on the street with some friends. Id. at 69-71. Aaron Carter ("appellant") began to walk up the street, and Lowman told Yasin to go home. Id. The appellant approached Lowman, and the two began to talk. Id. at 72. After a few moments, Lowman turned and began to walk away from the appellant. Id. at 72. Appellant pulled out a handgun and shot Lowman seven (7) to eight (8) times in the back. Id. After Lowman fell to the ground, he attempted to return fire, but the appellant fled the scene. Id. at 76-78. The appellant was later apprehended after Yasin provided a statement to police and identified the appellant from a photo array. Id. at 88-89.
>
> Following jury selection and two (2) days of testimony, the appellant withdrew his plea of not guilty and entered an open guilty plea. N.T. 12/3/2008, pgs. 11-23.

The trial court also summarized the guilty plea offers presented to petitioner by the prosecution before trial commenced.

> The record substantiates that prior to trial, the prosecution made two (2) offers to the appellant. Initially, the Commonwealth offered the appellant the opportunity to plead guilty to third degree murder with its sentencing recommendation being capped at fifteen (15) to thirty (30) years incarceration. That offer was lowered to twelve [and one-half] (12 ½) to twenty-five (25) years imprisonment, as the Commonwealth sought to avoid the trauma of having the minor eyewitness take the stand. N.T., 12/2/08, pg. 11. The appellant . . . rejected this offer. N.T., 12/2/08, pgs. 11-13. On December 3, 2008, at his request, the trial was suspended and appellant entered a guilty plea following an extensive oral colloquy. N.T., 12/3/08, pgs. 11-24.
>
> . . .
>
> The appellant was initially offered fifteen (15) to thirty (30) years incarceration and this offer was lowered to twelve and one-half (12 ½) to twenty-five (25) years imprisonment, which he also rejected. N.T., 12/2/08, pg. 11. During the oral colloquy, the court

explained, in detail, that third degree murder carries a maximum of twenty (20) to forty (40) years incarceration and that there were no negotiations between the Commonwealth and the appellant.

(Doc. No. 16 at 1-2) (quoting Commonwealth v. Carter, No. CP-51-CR-11928-2007, slip op. at 1, 2, 4 (C.P. Phila. Cty. Apr. 21, 2009).[1]

**B.  Procedural History**

Following his sentencing, Petitioner filed several post-sentence motions including ones to withdraw his guilty plea and to reconsider his sentence.  (Doc. No. 16 at 2.)  The trial court denied each of these motions.  (Id.)

Next, Petitioner filed his first appeal raising three issues:

> 1.      Where the Commonwealth had agreed to suggest a sentence of fifteen to thirty years but the sentence imposed was twenty to forty years, did the [C]ommon [P]leas [C]ourt err in denying Aaron Carter's petition to withdraw his guilty plea?

> 2.      Where the [C]ommon [P]leas [C]ourt participated in guilty plea negotiations, did the court err in denying Aaron Carter's peititon to withdraw his guilty plea?

> 3.      Where the Commonwealth had agreed to suggest a sentence of fifteen to thirty years but the sentence imposed was twenty to forty years, did the [C]ommon [P]leas [C]ourt err in denying Aaron Carter's motion for reconsideration of sentence and was Mr. Carter impermissibly punished for exercising his right to a jury trial?

(Doc. No. 16 at 2-3, citing Commonwealth v. Carter, 998 A.2d 994, No. 571 EDA 2009, slip op. at 2-3 (Pa. Super. Ct. Mar. 22, 2010) (quoting Appellant's Brief at 2).)

The appellate court denied each of these claims.  The appellate court found that Petitioner waived the first claim by not raising it in the trial court.  (Doc. No. 16 at 3.)  The court also found

---

[1] Rashad Lowman's younger cousin, Yasin Lowman, would testify later at Petitioner's murder trial.  The Commonwealth attempted to save Yasin the agony of testifying by offering Petitioner plea agreements with reduced sentences.  Yasin's testimony and his ordeal in testifying influenced the sentence Judge Renee Cardwell Hughes' imposed.

that Petitioner waived the second claim by failing to include it in his Pa. R. A. P. 2119(f) statement.[2]  (Id.)  Additionally, the Commonwealth objected to the failure to include the claim. (Id.)  Moreover, the appellate court found Petitioner's third claim meritless because:

> [Petitioner] rejected the Commonwealth's offer for a 15-30 year sentence, and instead opted to plead guilty in exchange for an open sentence to be determined by the court.  In doing so, Appellant voluntarily ran the risk that the court would impose the maximum term on the murder charge.  As the Commonwealth aptly puts it, "[Petitioner] is not now entitled to reap the benefits of the rejected offer." Commonwealth's Brief at 6.

(Doc. No. 16 at 4.)  On March 22, 2010, the Superior Court of Pennsylvania affirmed Petitioner's judgment of sentence.

On December 30, 2010, Petitioner filed a pro se petition for relief under the Post-Conviction Relief Act.  Petitioner raised two claims: (1) unlawful inducement of a guilty plea and (2) ineffective assistance of trial, appellate, and PCRA counsel.  See Commonwealth v. Carter, 2013 WL 9863766, at *2 (Pa. Com. Pl. Dec. 5, 2013).  Counsel was appointed for Petitioner and subsequently filed a no merit letter pursuant to Commonwealth v. Finley.[3]  550 A.2d 213 (Pa. Super. Ct. 1988) (en banc).  On October 25, 2013, the PCRA court dismissed the

---

[2]  Pennsylvania Rule of Appellate Procedure.  Pa. Code Rule 2119. Argument.

> (f) Discretionary Aspects of Sentence – An appellant who challenges the discretionary aspects of a sentence in a criminal matter shall set forth in a separate section of the brief a concise statement of the reasons relief upon for allowance of appeal with respect to the discretionary aspects of a sentence.  The statement shall immediately precede the argument on the merits with respect to the discretionary aspects of the sentence.

[3]  In Commonwealth v. Finley, a prisoner filed a pro se petitioner for post-conviction relief.  550 A.2d 213 (Pa. Super. Ct. 1988) (en banc).  He was appointed counsel who filed a "no merit letter" with the court.  The Superior Court of Pennsylvania found that the appointed counsel's "no-merit letter" coupled with the court's independent review of evidence in light of pro se post-conviction requests for relief comported with prisoner's entitlement to effective counsel.

4

PCRA petition. <u>Commonwealth v. Carter</u>, 2013 WL 9863766, at *1. During the PCRA hearing,

the judge who presided over the PCRA petition was not the trial court judge. (<u>Id.</u>)

Following the dismissal of his two PCRA claims, Petitioner next filed an appeal to the

Superior Court of Pennsylvania. Petitioner raised seven grounds for PCRA relief in that appeal.

They were:

> 1. Whether the PCRA court erred by allowing [the] PCRA Counsel to withdraw and dismiss [sic] PCRA petition, when petition had meritorious issues [sic]?
>
> 2. Whether the PCRA court erred for not restoring post-verdict motions, [and] was PCRA counsel ineffective for not [a]mending [the] argument?
>
> 3. Whether PCRA court erred for not granting PCRA argument to have Direct Appeal right's [sic] restored [and] was PCRA counsel ineffective for failing to amend/supplement his argument?
>
> 4. Whether PCRA court erred for not granting PCRA argument that trial counsel was ineffective for failing to object when the court participated in the plea bargaining process, was PCRA counsel ineffective for failing to amend/supplement this argument[?]
>
> 5. Whether the PCRA court erred for not granting argument that trial counsel was ineffective for failing to object to the court's violation of plea agreement at sentencing, [and] was PCRA counsel ineffective for failing to amend/supplement this argument?
>
> 6. Whether PCRA court erred for not granting arguments that trial counsel was ineffective at sentencing for failing to object at sentencing when the court considered impermissible factor's [sic] and acted vindictive towards the Appellant for exercising his right to trial, [and] was PCRA counsel ineffective for failing to amend/supplement this argument?
>
> 7. Whether PCRA court erred for not allowing Appellant to raise the issue of PCRA counsel's ineffectiveness in Appellant's response to court's intent to dismiss notice. Did PCRA court prematurely rule on Appellant's response to intent to dismiss order by not honoring the mailbox rule?

(Doc. No. 16 at 4, quoting <u>Commonwealth v. Carter,</u> 113 A.3d 348, No. 3197 EDA 2013, slip op.

at 3-4 (Pa. Super. Ct. Nov. 13, 2014).) The Superior Court of Pennsylvania denied each of

Petitioner's seven claims and affirmed the PCRA court's dismissal of the petition.   (Id.) Thereafter, on May 4, 2015, Petitioner's request for allowance of an appeal was denied by the Supreme Court of Pennsylvania.  See Commonwealth v. Carter, 114 A.3d 415 (Pa. 2015).

### C.  Relevant Testimony and Portions of the State Court Record

#### a.  Relevant Portions of the State Record From Petitioner's Pre-Trial and Trial Plea Negotiations

The Honorable Renee Cardwell Hughes of the Court of Common Pleas for Philadelphia County served as trial judge during Petitioner's trial.[4]   On December 1, 2008, prior to jury selection, Judge Hughes, Petitioner, and his counsel, Nino Tinari, Esquire, had the following exchange:

| | |
|---|---|
| Court: | Mr. Carter, it's my understanding that the Commonwealth made you an offer this morning, that they made you two types of offers. They made you an offer where you could plead guilty to third-degree murder and plead what we call open, open being that I would ultimately decide what was an appropriate sentence. |
| | Commonwealth indicated that they have a feeling about the recommendation that they would make, but they would agree to let you plead open and it would be my decision as to what sentence you actually get. |
| | I know that you and Mr. Tinari and your mother had an opportunity to talk about that this morning and I know that you and Mr. Tinari have talked about it more than once.  I wanted however, to find out what your perspective was and what you were thinking. |
| Defendant: | Fifteen years is a lot of time, Your Honor. |
| Court: | I'm sorry, I think that's where we're having the breakdown in communication here.  The sentence is a plea to third open, which means you would not automatically get 15 years.  You could, okay. |
| | Third-degree murder the maximum punishment is 40 years, which means the bottom number would be 20.  Commonwealth is going to ask for 15.  They've been honest.  I don't have to give you 15 if I don't think you deserve it. |

---

[4] Judge Hughes has since retired from the Court of Common Pleas for Philadelphia County.

So I guess that's part of what I am not processing.  Why do you think the sentence is going to be 15, because that's not what you would be pleading to.  You would be pleading to third-degree murder with me being able to make a decision as to what's appropriate based on your criminal history, your background, based on the facts of the case . . . So why do you keep saying 15 years is a long time?

Defendant:   Well, just pleading open, I mean not knowing what I am going to get.

Court:   That's true.  So you would rather - - are you saying you would be interested if it were a negotiated plea?

Defendant:   Yes.

Court:   Is there some number that you think is fair?

Defendant:   Seven and a half to 15.

Court:   And why do you think seven and a half to 15 is a fair number?  Where did you get that number from, because that number is below the guideline recommendations?

                                           . . .

Defendant:   I feel as though I should be sentenced to no more than that.

Court:   That's not what I asked you, Mr. Carter.  I asked you why you think that, and that's a different question.  All right, since you don't want to answer, let me talk to you and help you understand some things . . . This jury is going to be charged with first and third.  First is life.  In Pennsylvania, that means you will absolutely never get out of jail.  It's irrelevant whether you are a model citizen in jail.  That's what "life" means.

Third-degree means that it's my decision, just like pleading open to third, but the reality is that it's unlikely that I will give you what you're asking for if you are responsible for a citizen's death and you go through a trial gambling.  I wouldn't give you that.  So I need you to understand the risk that you run is that you could be facing life and that you would never come home at all.  Now, seven and a half, I have to understand why you even remotely begin to think that that's a fair number.  Have you ever been arrested before?

Defendant:     No, Your Honor.

Court:          [I]n the juvenile system have you ever been arrested?

Defendant:     Yes, Your Honor.

                                    . . .

Court:          Why do you think seven and a half is a fair number for a life?

Defendant:     Your Honor, I haven't been locked up before as an adult.  I really
                think - -

Court:          And you took a life and you think seven and a half is a fair number
                for a life? And that's what you have to think about because that's
                what I have to think about and I have to think about why you took
                that life, and that really is very, very important, Mr. Carter.  How
                old are you?

Defendant:     I'm 20 years old, ma'am.

Court:          Now, I'm not sitting here telling you that I think the
                Commonwealth's number is fair because I don't know that I do, I
                really don't.  I don't know what I think right now.  I don't know
                enough about you to figure out what I think is fair, but let's say it
                was a fair number.  That means you'd be 35 on the day you come
                out of prison, okay.   Well, no, you would be 33 because you
                already have two years credit . . .

                I can tell you right now where I was at 33.  I was a practicing
                lawyer here in Philadelphia.  I had finished law school.  I was not
                married.  I was dating.  I had no children.  Today I'm divorced, not
                that you care, but I have been married.  I have a magnificent child
                and I had none of those things at 33 . . . And I share that with you
                deliberately . . . not because I think the Commonwealth's offer is
                the right number.  I don't know, okay, I just don't know enough to
                say it's the right number.  But what I know is that if that's the worst
                thing you're looking at is 13 more years inside, I know from 33 to
                today what I have done with my life, you'll still be a baby at 33 . . .
                you can have whatever life you choose to have.

                . . . I can't tell you I think seven and a half - - that's not true, I can.
                It would have to be extraordinary circumstances.  I have given a
                young man five years for a homicide, but it was extraordinary

circumstances . . . You may have extraordinary circumstances, but I'm not going to play any games with you.  Based on the minimal offer of proof that I've hear, I don't think so . . . [T]his is not self-defense, was it?

Defendant:      It's up to the jury to determine?

Court:          No, it's not, sweetheart, because if it's self-defense, you have to have filed notice and there's been no notice filed.  So you, number one, are not a lawyer.  You been listening to a lot of people who are in jail who pretend that they're lawyers.   I, having known Mr. Tinari now for a long time, know that it didn't come cheap for your family to hire him for you.

                                    . . .

                I would humbly suggest that you listen to his years of experience and not the people up in the jail who advise you.  No notice of self-defense has been offered in this case . . . This is not self-defense.

                I don't want to see you throw your life away.  The Commonwealth will be seeking first degree . . . You have no witnesses other than the people who were present.  And based on the limited offer of proof that's been given me, the people who were with you have Fifth Amendment problems and won't be coming in.

                So once again why do you think seven and a half is a fair number.

Defendant:      Your Honor, 15, I mean I'm young, you're right, but ten years is a lot of time.

Court:          Do you have any feelings for the life you took? Do you?

Defendant:      Your Honor, I'm innocent until proven guilty.

Court:          Mr. Carter, that is very true, but that is not at all what we're discussing.  What we're discussing is do you have any feelings for the life that you took?  This is not a waiver, I'm not going to decide your case.  I will tell the jury that you're innocent until proven guilty. . . Because everything that you say you're focused on now, how long you're going to have to serve time and you don't want to serve any time, I would well imagine that this young man that you killed had dreams and hopes and aspirations and I would well imagine that his family had feelings for him too.  Now, you have the opportunity to walk out of prison a young man.  He won't have that opportunity to do anything again ever and you both were

9

> carrying guns, I know that, and that's something that is highly
> relevant to be considered, but he didn't draw first, you did.
>
> . . .
>
> The Commonwealth has said that they would ask for no more than
> 15.  Mr. Tinari would ask for significantly less that 15.  You've
> already said for some reason your magic number is seven and a
> half.  So if you believe it so powerfully, do you believe it
> powerfully enough to try and convince me you're right?  The worst
> you're going to do is 15, which means you come home at 33.  The
> best you're going to do is what you're asking for is seven and a
> half.  Why would you run the risk of getting life?
>
> . . .
>
> You don't want to think about it?

Defendant:     No ma'am.

Court:         All right.  Mr. Carter, we don't have to think about it.  Okay.  I will
               share with you very bluntly you're ill-advised and you're making a
               very, very bad decision, all right.   You're making a very bad
               decision, but it's yours to make and so we will go forward to trial.

(N.T., 12/1/08, at 3-18.)  This exchange highlights the initial interaction between Honorable

Renee Cardwell Hughes and Petitioner.   On December 1, 2008, Petitioner rejected the

Commonwealth's initial plea agreement offer.  The case proceeded to trial.  A jury was selected

on the afternoon of December 1, 2008.

       The following day an on-the-record discussion took place in the robing room.  Present at

the meeting were Judge Hughes, defense counsel, and the attorneys for the Commonwealth.

Petitioner was not present for these discussions.  At that time, defense counsel told Judge Hughes

that the Commonwealth made a second, more favorable, plea offer of twelve and one-half to

twenty-five years.  Petitioner once again rejected this offer.  Following the meeting and on that

same morning, December 2, 2008, Judge Hughes held a motions hearing.  At the motion's

hearing, Petitioner's motion to suppress his statement to the police was adjudicated.    Judge Hughes denied the motion.

Additionally, at the motions hearing, defense counsel made an oral motion requesting Judge Hughes recuse herself.  In his instant Petition for Writ of Habeas Corpus, Petitioner states that on December 2, 2008, he:

> pressured trial counsel (Tinari) to make an oral motion to recuse the judge because of "the conversation yesterday," and trial counsel's ineffectiveness because he insisted Petitioner take the offers which he felt "were good ones." (N.T. 12/2/08 pgs. 9-10.)

> The court denied the motion, explaining that it was "not wasting time this morning," and stating, "I have no reason to recuse myself because it's a jury and a fact finder will decide this case." (Id. at 10.)

> The fact that Petitioner insisted his attorney make this motion is proof Petitioner believed he was facing a judge who was not impartial.  This placed Petitioner in the difficult position of either proceeding with a jury trial before a judge he knew was not impartial, or pleading guilty and trying to minimizing [sic] the damage.

(Doc. No. 1 at 42.)  Petitioner claims in his Petition that trial counsel had no strategic reason to pressure him into pleading guilty.    (Id.)    Petitioner also asserts that the trial court acted improperly by trying to convince him to accept the Commonwealth's plea agreement.    (Id.)

Following the exchange in the robing room, Petitioner's trial began.  On December 2, 2008, witnesses testified in Petitioner's trial.  The following day, on December 3, 2008, another on-the-record discussion was held in the robing room.  It appears from the record that defense counsel, Judge Hughes, and attorneys for the Commonwealth were again the only parties present. The Petitioner was not present.  The following exchange occurred:

> Defense Counsel:    Since I walked in to talk to him, he says to me, I told him Marcus was here, Boston.  He says is the plea still on the table.  I says I don't know, I says I got to talk to the DA, I have to talk to Her Honor.  He can be playing games.  I said I'll let you know if it is.  Chris said it is.

| DA: | I called Ed and my position is he can plead open to third. I'll make a recommendation.  It may not necessarily be the recommendation I was going to make before. |

. . .

| Defense Counsel: | Judge, I told him I didn't know whether anyone would even listen to me at this point. |

(N.T., 12/3/2008, at 4-5.)

After Petitioner rejected the two plea offers by the Commonwealth, his motion to suppress his statement to the police had been denied, and learning by implication that witness Marcus Boston would testify against him, Petitioner made a request to plead guilty.[5]  (Doc. No. 16 at 16.)  The court and the Petitioner then engaged in the following colloquy:

| Court: | Clearly, we are in the middle of trial.  You have requested to plead guilty to murder in the third degree and possession of an instrument of crime.  The Commonwealth does not oppose your request.  Are you pleading guilty because you are in fact guilty? |

| Defendant: | Yes, Your Honor. |

| Court: | Mr. Carter, we have completed virtually half of this trial.  The Commonwealth has one, two, three witnesses left.  So it is very important that you understand that if I were to accept your guilty plea from you, I would consider the Commonwealth to have been prejudiced and disadvantaged and I would not allow you to withdraw your guilty plea.  Do you understand? |

| Defendant: | Yes, Your Honor. |

| Court: | Do you wish to go forward knowing that you would not be permitted to withdraw your guilty plea? |

| Defendant: | Yes, Your Honor. |

| Court: | This would in effect become final.  Do you understand? |

| Defendant: | Yes, Your Honor. |

---

[5] Marcus Boston was a Commonwealth witness, who from the statements made on the record, would have likely implicated the Petitioner as Lowman's murderer.

12

| | |
|---|---|
| Court: | The other significant issue that you need to be absolutely clear about is that when you enter a guilty plea, there are basically only three reasons from which you may file an appeal and I deliberately eliminate [sic] all three.  When you have a trial, there are a lot of reasons that a person could file an appeal, but when you file a guilty plea, there are only three. |

. . .

| | |
|---|---|
| | The other basis for the appeal would be if I were to give you an illegal or an improper sentence.  Now, murder in the third degree is punishable by a maximum of 20 to 40 years incarceration and possession of an instrument of crime is punishable to two and a half to give years incarceration of a total maximum sentence of 22 and a half to 45 years. |
| | I share that with you not because that's the sentence I'm going to give.  At this moment in time I really have no idea what sentence I would give.  I share that with you because you need to be clear about what the maximum possible punishment is so that you understand what the basis for an appeal would be.  If I were to give you more than 22 and a half years, that would be an illegal sentence.  Do you understand? |
| Defendant: | Yes, Your Honor. |
| Court: | Do you still wish to go forward knowing that that basis for an appeal exists? |
| Defendant: | Yes, Your Honor. |
| Court: | The final basis for an appeal is the one that I think is the absolute most important, and that is whether this is in fact your voluntary decision.  Mr. Carter, this offer was made to you prior to trial.  This offer was made to you a second time after trial started.  You now have initiated this request to plead.  Are you absolutely certain that this is your decision to plead guilty? |
| Defendant: | Yes, Your Honor. |
| Court: | And you are pleading guilty because you are in fact guilty of the murder of Rashaad Lowman? |
| Defendant: | Yes, Your Honor. |

13

Court:          I know that you and Mr. Tinari have talked innumerable times.  I believe you have also been afforded the opportunity to speak with your family.  Is that true?

Defendant:      Yes, Your Honor.

Court:          Do you have any questions or concerns about this decision to plead guilty?

Defendant:      No, Your Honor.

Court:          Now, Mr. Carter, you have completed the tenth grade?

Defendant:      Yes, Your Honor.

Court:          You are 20 years old?

Defendant:      Yes, Your Honor.

Court:          Did you read this document or did Mr. Tinari read it to you?

Defendant:      Both.

Court:          Both, Excellent.  Did Mr. Tinari address all of your questions and concerns about the document and about the proceeding?

Defendant:      Yes, Your Honor.

Court:          Very good.   Now, sir, do you suffer from any type of mental disability?

Defendant:      No, Your Honor.

Court:          Including depression or stress, anything that could cause you to plead guilty when it's really not in your best interest to plead?

Defendant:      No, Your Honor.

Court:          Are you now or have you been within the last two days under the influence of drugs or alcohol or prescription medication?

Defendant:      No, Your Honor.

Court:          Are you satisfied with Mr. Tinari and the advice that he has given you?

| Defendant: | Yes, Your Honor. |
|---|---|
| Court: | And you are pleading guilty of your own free will because you are guilty? |
| Defendant: | Yes, Your Honor. |

(N.T., 12/3/2008, at 12-17.)

In addition to the oral exchange between Petitioner and the court on the record, Petitioner also signed a Written Guilty Plea Colloquy.  (Doc. No. 16 at 19.)  Petitioner acknowledged that he could receive a jail sentence of up to twenty-five years.  (Id.)  Petitioner stated that "[n]obody promised me anything or threatened me or forced me to plead guilty.  I, myself, have decided to plead guilty.  I know what I say is final . . . [t]here is no plea bargain or agreement of any kind," and that the District Attorney did not recommend that Petitioner receive a certain sentence.  (Id.)  Next, the court accepted Petitioner's guilty plea.  Petitioner then stated, "Your Honor, I'd like to thank you for giving me the opportunity to plead guilty and I know I had a chance to plead before, but I didn't.  I was under - - you know, I just didn't know at that time."  (N.T., 12/3/08, at 23.)

### b.  Relevant Portions of the State Record From Petitioner's Sentencing Hearing

On January 23, 2009, the state court reconvened for a sentencing hearing.  (Doc. No. 16 at 19.)  At the hearing, the court heard impact statements from the victim's family members, statements from the Petitioner and his counsel, and read the victim's toxicology report.  (Id.)  Next, the court imposed a sentence of twenty to forty years incarceration on the third-degree murder charge to be served concurrently with a term of two and one-half to five years incarceration on the possession of an instrument of crime charge.  (Id.)  At sentencing the trial judge made the following statements:

> Clearly, you know I read your letter because that's where I learned about the PCP [in the victim's blood].  I don't know what happened out there.  I still don't know

what happened out there.  I'm really bothered by all of this.  I'm bothered because there were eight bullets to his back - - that's not true.  There was one bullet to his groin.  And that has an extraordinary significance on the street and it has an extraordinary significance to me.  And the ME tells me his wounds were defensive and the rest were to his back.  There is no question two guns were out there with .380s on the street and .45s on the street.  There are 15 .45s and four .380s.  So I don't have an honest picture about what happened.

I don't process that a person whom you deemed to be a brother you could shoot six times on the back, once in the groin and once through the hand when he had his hand up.  I can't process this.

You are smart.  Your mother is right, you're very smart.  This has got to be one of the most eloquent letters I have received in 14 years.  Because you chose to plead guilty, you have an opportunity to have a life.  I will be candid with you, I think a lot of what you wrote to me is BS.  I really do.  I think you're saying what you need to say because you still face a significant number of years.

I don't understand you today any more than I understood you on the day when I begged you to take the Commonwealth's offer of 15 to 30.  And I asked you straight up - - and you said you shouldn't do 15 years.  I asked you straight up, didn't this boy's life - - it was seven, that was the magic number.  That was the number you thought was fair and decent.  I asked you why; because you couldn't do more time.  And I asked you straight up, didn't Rashaad's life have any value?  And you refused to answer me that day. And then you wrote me this letter and told me how much you loved him and how he was like a brother to you.

And somebody's lying to me because these people all live in the same house and they don't know who you are . . .

So what I struggle with is what is fair given my own confusion.  I don't think you're being honest with me.  I think you're sincerely remorseful because I think finally, finally you realize what you have done to your mother . . .  I think the remorse is genuine in part . . .

So I do think there is some level of remorse there.  I don't know if it's the level of remorse that matters to me.  So I really struggle with what is fair and decent in this circumstance.

Mr. Tinari is a really good lawyer.  He explained to you what your options are so you now you will be young when you come home no matter what I do today.  I have no desire, I have no need to be vindictive.  But out of all the things I can't wrap my arms around and I don't understand, is how you can tell me you loved this man like a brother, and you let that baby [Yasin Lowman] take the stand, you let that baby relive watching his big brother - - I don't care what their blood relationship was - - you let that baby relive watching his cousin gunned down like

a dog in the street.  That's what I can't process because you knew you were guilty. You had given a statement.  You knew what the evidence against you was, but you let that little boy take the stand.  And the consequences of that not only did you take Rashaad Lowman, but you have damaged this child far more than just witnessing the death of his brother.  You psychologically damaged that child and set him back.

. . .

But the one thing I cannot get past is what you did to Yasin.  You know you were guilty.  You had a cake offer, 15 to 30 for eight bullets in the back.  I couldn't even believe the Commonwealth offered you that.  And you didn't take the offer until . . . you knew the jury was going to hear your statement.  That's when you were like, stop, wait, I can't beat this because the jury is going to hear this statement.

I need you to understand all these things that are going through my mind because if there is any scintilla of truth in this letter, if there is any truth that you have dedicated your life to your education and to preventing other young people from being where you are, I don't want you to walk out of here bitter and mean.  But I can't ignore the reality of what is in front of me.  I can't ignore the manipulation and dishonesty.  So I pray you choose to walk a different path.  The fights inside [the prison] make me wonder whether you will, but I pray that after today, you will walk a different path.

I was fully prepared as of last night, despite the three fights [in the prison], I was fully prepared as of last night, because all I had last night were the documents done on the report.  So I was like, Commonwealth's willing to let him plead.  I will let him go take the 15.  Then I read your letter.  Then I said, wait a minute, let me look at the tox[icology] report and ME's report.  Let me look at the ballistics report.  Let me read this letter again.

You should understand, I did read all the Lowman letters . . . It's not the Lowman letters that got to me.  It was your letter.  Because a large part of it is a snow job. You know it and I know it.  That's what hurts.  Because everybody around here still wants to give you a shot.  I'm going to give you a shot . . . But it would be inappropriate for me to give you a shot . . . but it would be inappropriate for me to give you 15 to 30.  I can't.  And I do think 20 to 40 is fair . . . And, no, it's probably not the number you really wanted to hear today, but I think when I look at everything and I listen to everybody, I think that's the number that is fair.

(Doc. No. 16 at 19-21.)

**D.  The Instant Writ of Habeas Corpus**

On August 31, 2015, Petitioner filed the instant request for habeas corpus asserting two

grounds for relief:

        1.      Trial counsel was ineffective because he failed to object to the court's participation in the plea bargaining process on December 1, 2008 which invalidated [P]etitioner's guilty plea that occurred on December 3, 2008.

        2.      Trial counsel was ineffective because he failed to object to the court's vindictiveness at sentencing as shown by the court's punitive assessment of petitioner's exercising his right to a trial and its maximum sentence.

(Doc. No. 1 at 38, 46.) On March 24, 2016, Respondents filed a Response. (Doc. No. 13.) On April 4, 2016 Petitioner filed a Traverse. (Doc. No. 15.) On June 6, 2016, United States Magistrate Judge Thomas J. Rueter filed the Report and Recommendation. (Doc. No. 16.) On August 8, 2016, Petitioner filed his objections to the Magistrate's Report and Recommendation. (Doc. No. 21.) On August 11, 2016, Respondents filed a Response. (Doc. No. 23.) The Objections are now ripe for consideration.

## III.    STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1)(B) and the local rules of this Court, a district judge is permitted to designate a magistrate judge to make proposed findings and recommendations on petitions for post-conviction relief. Any party may file objections in response to the magistrate judge's Report and Recommendation. 28 U.S.C. § 636(b)(1)(C). Whether or not an objection is made, a district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The [district] judge may also receive further evidence or recommit the matter to the magistrate judge with further instructions." Id. "[I]t must be assumed that the normal practice of the district judge is to give some reasoned consideration to the magistrate's report before adopting it as the decision of the court." Henderson v. Carlson, 812 F.2d 874, 878 (3d Cir. 1987); see also 28 U.S.C. § 636(b).

In the Eastern District of Pennsylvania, Local Rule 72.1.IV(b) governs a petitioner's objections to a magistrate judge's Report and Recommendation. Under that rule, a petitioner

must "specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections[.]"   Savior v. Superintendent of Huntingdon SCI, No. 11-5639, 2012 WL 4206566, at *1 (E.D. Pa. Sept. 20, 2012).   Upon review, "[a district judge] shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."   28 U.S.C. § 636(b)(1)(C).

De novo review is non-deferential and generally permits the district court to conduct an "independent review" of the entire matter.   Salve Regina College v. Russell, 499 U.S. 225, 238, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).   "Although [the] review is de novo, [a district judge] [is] permitted, by statute, to rely upon the magistrate judge's proposed findings and recommendations to the extent [the judge], in the exercise of sound discretion, deem[s] proper."   Owens v. Beard, 829 F. Supp. 736, 738 (M.D. Pa. 1993) (citing United States v. Raddatz, 447 U.S. 667, 676 (1980)).

## IV.   ANALYSIS

### a.   Petitioner Was Not Deprived of Effective Assistance of Counsel By His Counsel's Failure to Object to Statements of the Trial Judge on December 1, 2008

In this case, Petitioner was offered a plea agreement by the state prosecutor on December 1, 2008.   The offer was made prior to jury selection and was for an agreed upon term of imprisonment of 15 to 30 years in exchange for a guilty plea to third degree murder.   Under Pennsylvania law, the maximum punishment for third degree murder is 20 to 40 years incarceration.

Petitioner turned this offer down.   Undoubtedly, the transcript of December 1, 2008 showing the Court's verbal interaction with Petitioner reflects the trial judge's belief that this plea agreement was in Petitioner's best interest and that he should accept the plea.   After it was turned down, jury selection began on the afternoon of December 1, 2008.

On December 2, 2008, the Commonwealth made a second, more favorable offer of twelve and one-half (12 ½) to twenty-five (25) years imprisonment. Petitioner also rejected this offer. Thereafter, a hearing was held on Petitioner's motion to suppress his statement to the police and his motion was denied. Following this ruling, at the trial several witnesses were called to testify including young Yasin Lowman, the eyewitness to the shooting, as well as several other witnesses. Moreover, Petitioner learned that Marcus Boston was going to testify against him, providing more incriminating evidence against Petitioner.

In view of the mounting evidence that Petitioner heard and observed, he decided on December 3, 2008, about halfway through trial, to plead guilty to murder in the third degree and possession of an instrument of crime. Petitioner then admitted his guilt. He was informed by the trial judge that the maximum possible sentence for third degree murder was 20 to 40 years incarceration and for possession of an instrument of crime was two and one-half (2 ½) to five (5) years incarceration. He was told that the total maximum sentence he faced by pleading guilty was twenty-two and one-half (22 ½) to forty five (45) years imprisonment. The court informed Petitioner that "at this moment in time I really have no idea what sentence I will give." (Doc. No. 16 at 17.) Petitioner spoke to his attorney about the plea innumerable times and also spoke with his family. He informed the court that he was satisfied with the advice that his attorney gave him. He also said he was pleading guilty of his own free will. After the court accepted petitioner's guilty plea, Petitioner stated as follows: "Your Honor, I'd like to thank you for giving me the opportunity to plead guilty and I know I had a chance to plead before, but I didn't. I was under - - you know, I didn't know at that time." (Id. at 19.)

Petitioner contends in his objections to the Report and Recommendation that trial counsel was ineffective for failing to object to the court's participation in the plea bargaining process on

December 1, 2008 and that this participation invalidated Petitioner's guilty plea on December 3, 2008.  But Magistrate Judge Rueter correctly found as follows:

> This court finds no link between the trial court's participation in the plea bargaining process on December 1, 2008, and petitioner's request to plead guilty two days later on December 3, 2008, after his suppression motion was denied and he learned a witness would testify against him, and after rejecting the Commonwealth's subsequent more favorable guilty plea offer, which offer the trial judge did not discuss with petitioner at the time.

(Id. at 24.)  Moreover in footnote 1 on page 24 of the Report and Recommendation, Magistrate Judge Rueter also correctly found:

> If the state court had improperly participated in the guilty plea process on December 1, 2008, such action was harmless error since petitioner did not take that guilty plea and rejected an even more favorable guilty plea the next day.  The trial court was not involved in the guilty plea discussions with respect to the second more favorable plea offer.  Claims of improper participation in plea negotiations are subject to a harmless error analysis.  United States v. Davila, 133 S. Ct. 2139, 2149 (2013) (considering Fed. R. Civ. P. 11(c)), the passage of time between the trial court's alleged improper action and the defendant pleading guilty impacts whether an error was prejudicial).  As noted above, trial counsel cannot be found to be ineffective for failing to raise a meritless claim.

(Doc. No. 16 at 24.)

The Court agrees and adopts the findings of Magistrate Judge Rueter because it is obvious that Petitioner entered his guilty plea on December 3, 2008 independent of any prior statements made to him by the trial judge on December 1, 2008.  This undermines any notion that trial counsel was ineffective for failing to object to the trial judge's comments on December 1, 2008.

In order to constitute ineffective assistance of counsel, a petitioner must satisfy the two well-known prongs of Strickland: (1) that counsel's performance was deficient and (2) that counsel's deficient performance caused the petitioner prejudice.  Strickland v. Washington, 466 U.S. 668 (1984).  Here, in view of the considerable evidence of guilt that Petitioner faced, he

decided of his own free will to enter his guilty pleas.  He consulted with counsel and his family about his decision and knew he faced a sentence of twenty-two and one-half (22 ½) to forty-five (45) years imprisonment by pleading guilty to the offenses.  Counsel's failure to object two days earlier to the conduct of the trial judge did not render counsel's performance deficient or prejudicial to Petitioner who made his own decision to plead guilty.

Petitioner's claim of ineffective assistance of counsel by the failure of his lawyer to object to the trial judge's comments on December 1, 2008 hangs on one phrase in one sentence in Commonwealth v. Evans.  252 A.2d 689 (Pa. 1969).  In Evans, the court did hold that a state trial judge may not participate in plea bargaining "prior to the offering of a guilty plea."  Unlike this case, though, in Evans, the defendant entered his guilty plea on the belief that he would only be sentenced on one of five counts if he pled guilty.  Id. at 690.  Unlike the defendant in Evans, Petitioner had no such guarantee and entered his guilty plea two days subsequent to the trial judge's comments.  Evans does not hold that a guilty plea is automatically invalidated and can never be entered at a later date just because a judge participates in the plea process earlier in the case.  With the passage of time and the ability of a defendant to see and hear the mounting evidence against him, a valid guilty plea can still be entered by the defendant.

There was no participation by the trial judge in the plea bargaining process on December 3, 2008 prior to Petitioner entering his guilty plea.  Because there was no impediment to Petitioner pleading guilty on that day, and no link to the events of December 1, 2008, trial counsel could not be faulted for failing to object to the trial judge's comments on December 1, 2008.  Accordingly, Petitioner's first objection to the Report and Recommendation (Doc. No. 16) will be denied.

**b. Petitioner's Objection That Magistrate Judge Rueter Found That He Was Not Entitled to Relief Because State Law Alone Was Violated Is Without Merit**

In the Report and Recommendation (Doc. No. 16), Magistrate Judge Rueter does note

that:

> Additionally, petitioner asserts that his guilty plea should be invalidated because the trial court's participation in the plea process on December 1, 2008 violated state law as set forth in Commonwealth v. Evans, 252 A.2d 689 (Pa. 1969) and Pennsylvania Rule of Criminal Procedure 590. It is well settled that a violation of a state rule does not give rise to a federal constitutional claim. Wilson v. Corcoran, 562 U.S. 1, 5 (2010). See also Miles v. Dorsey, 61 F.3d 1459, 1466-67 (10th Cir. 1995) (federal and state rules barring judicial participation in plea negotiations do not necessarily establish a constitutional prohibition [applicable in state courts]). Moreover, the state court concluded that the trial court had not violated state court precedent or state procedural rules. Commonwealth v. Carter, No. 3197 EDA 2013, slip op. at 7-8 (Pa. Super. Ct. Nov. 13, 2014). This conclusion regarding the application of state law is binding upon this court. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("we have repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (not the province of the federal court to re-examine a state court's determination on state law questions); Pulley v. Harris, 465 U.S. 37, 41 (1981) ("A federal court may not issue the writ on the basis of a perceived error of state law.").

(Doc. No. 16 at 25.)

However, in the quote above, Magistrate Judge Rueter was merely rejecting a claim of

Petitioner that his guilty pleas should be invalidated because the trial judge improperly

participated in the process on December 1, 2008 in violation of state law. But as Magistrate

Judge Rueter noted, a violation of a state rule does not give rise to a federal constitutional claim.

Needless to say, a federal habeas claim can only be granted pursuant to 28 U.S.C. § 2254 if the

claim:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

23

28 U.S.C. § 2254(d).

By making his findings that a violation of state law cannot be a basis to grant a federal habeas petition, Magistrate Judge Rueter was not overlooking the fact, as Petitioner asserts in his objections, that his ineffective assistance of counsel claim was based on federal law as set forth in Strickland and not on the alleged state law violation alone.  Prior to writing the above quote in the Report and Recommendation, Magistrate Judge Rueter clearly noted that Petitioner was arguing that trial counsel was ineffective for failing to object to the trial judge's participation in the plea bargaining process.  He ultimately found, as noted in footnote 1, that trial counsel could not have been ineffective for not making a meritless objection.  Even if one reads the Report and Recommendation in accordance with Petitioner's more restrictive reading he argues here, in view of the open guilty pleas on December 3, 2008, ineffective assistance of counsel has not been shown.

### c.  Petitioner's Objections To Magistrate Judge Rueter's Finding That There Was No Vindictiveness Exuded By The Trial Court During Sentencing is Unavailing

In the objections to the Report and Recommendation of Magistrate Judge Rueter, Petitioner claims that certain language used by the trial judge at sentencing showed vindictiveness and an intent to punish Petitioner for exercising his right to a trial by jury.  He relies upon the trial judge's statement that, "I don't understand you today any more than I understood you on the day when I begged you to take the Commonwealth's offer of 15 to 30." (Doc. No. 16 at 18.)  Petitioner also refers to the trial judge's statements that "[b]ut one thing I cannot get past is what you did to Yasin.  You had a cake offer, 15 to 30 for eight bullets in the back."  (Id. at 21.)  Additionally, Petitioner points to the following comments made by the trial judge during sentencing:

> But out of all the things I can't wrap my arms around and I don't understand, is how you can tell me you loved this man like a brother and you let that baby

> [Yasin] take the stand, you let that baby relive watching his big brother – I don't care what their blood relationship was – you let that baby relive watching his cousin gunned down like a dog in the street.  That's what I can't process because you knew you were guilty . . . And the consequences of that not only did you take Rashaad Lowman, but you have damaged this child far more than just witnessing the death of his brother.   You psychologically damaged this child and set him back.

(Doc. No. 21-1 at 7-8.)

Magistrate Judge Rueter carefully reviewed the law on the standard for judicial vindictiveness, which began in <u>North Carolina v. Pearce</u>.  395 U.S. 711 (1969).  Magistrate Judge Rueter went on to analyze three Third Circuit cases which discussed vindictiveness in the context of sentencing.  Magistrate Judge Rueter had the opportunity to apply the standards set forth in these cases in <u>White v. Lamas</u>.  905 F. Supp. 624 (E.D. Pa. 2012) (Kelly, J.) (approving and adopting Report and Recommendation of Magistrate Judge Thomas J. Rueter).

> In <u>White</u>, this court concluded that the trial judge, the same judge at issue in this case, Judge Hughes, vindictively imposed the maximum sentence justifying relief for purposes of resentencing the petitioner.  This court concluded that "it appears that Judge Hughes imposed the maximum sentence in punishment for petitioner's decision to proceed to trial.  Moreover, . . . the comments of Judge Hughes during sentencing regarding petitioner's choice to go to trial create the appearance of partiality.

<u>Id.</u> at 642.  In this case, Magistrate Judge Rueter came to the opposite conclusion in considering the totality of the statements made by the trial judge at sentencing.  On pages 32 and 33 of the Report and Recommendation, Magistrate Judge Rueter methodically discussed the trial judge's statements at sentencing.[6]

Magistrate Judge Rueter found that in applying the principles set forth in the cases to the Petitioner's case, the trial court did not commit a constitutional error by considering, as a

---

[6] Petitioner was sentenced to twenty (20) to forty (40) years incarceration on the third degree murder offense and to two and one-half (2 ½) to five (5) years incarceration on the possession of an instrument of crime offense.  The sentences ran concurrently.

sentencing factor, Petitioner's decision to exercise his right to a trial by jury rather than taking a plea agreement on December 1, 2008.  For example, the trial judge considered the following at length at sentencing: the unconvincing letter of remorse Petitioner submitted, the Medical Examiner's report that the victim's wounds were defensive, the toxicology report that showed the victim had PCP in his system at the time of his death, the anguish the witnesses endured when testifying at trial—including Yasin Lowman's testimony, the three fights Petitioner engaged in while in prison, and the mounting evidence against Petitioner.

Based upon the above, Magistrate Judge Rueter correctly found that the trial judge sentence was justified and not motivated by vindictiveness.  He further found that:

> Since the trial court's actions were not improper, counsel cannot be found to be ineffective for failing to object to them.  Counsel is not ineffective for failing to raise a meritless objection.  The decision of the Superior Court of Pennsylvania rejecting this claim was not an unreasonable application of federal law

(Doc. No. 16.)

## V.   CONCLUSION

Under all these circumstances, defense counsel was not constitutionally ineffective.  The Report and Recommendation of Magistrate Judge Rueter dated June 6, 2016 will be approved and adopted and Petitioner's Habeas Petition will be denied.  (Doc. No. 16.)  A Certificate of Appealability will not be issued based on the analysis contained in the Magistrate Judge Rueter's Report and Recommendation, as approved and adopted by this Court, that a reasonable jurist could not conclude that the Court is incorrect in denying and dismissing the Writ of Habeas Corpus.  An appropriate Order follows.